**Mrs. Alice WEBSTER**

v.

**The UNITED STATES.**

**No. 231–62.**

United States Court of Claims

April 14, 1967.

Lester Fleming, Houston, Tex., for plaintiff.

William C. Ballard, Jr., Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM.

This case was referred to Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on January 6, 1966. Exceptions to the commissioner's findings, opinion, and recommendation for conclusions of law were filed by the parties. The case was submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion, findings, and recommendation of the commissioner, with modification, it hereby adopts the same, as modified, as its judgment in this case. Plaintiff is, therefore, entitled to recover, with the amount of recovery to be determined pursuant to Rule 47(c) (2).

Commissioner White's opinion,* as modified by the court, is as follows:

This case grew out of the assessment by the Commissioner of Internal Revenue against the plaintiff, Mrs. Alice Webster, of a deficiency and penalty with respect to the plaintiff's income tax for the calendar year 1952. The deficiency and penalty, plus interest, totaled $7,994.12, and the plaintiff paid this amount in installments during the period October 10, 1957–October 29, 1958. In the present action, the plaintiff seeks to recover the sum of $7,994.12, together with interest as provided by law.

The case presents three separate issues for decision by the court.

### Sale of Texas Land

The deficiency against the plaintiff resulted mainly from a determination by the Internal Revenue Service that the plaintiff, in her income tax return for 1952, had incorrectly reported the amount of the tax basis in 898.29 acres of land situated in Gray County, Texas, which the plaintiff sold in March 1952 for $66,343.50.

In her income tax return for 1952, the plaintiff reported the tax basis in the Texas land at the time of the sale as being $43,744.40, and the amount of the taxable gain realized from the sale of this land as being $22,599.10. Upon auditing the plaintiff's income tax return for 1952, the Internal Revenue Service determined that the tax basis in the Texas land at the time of the sale in March 1952 was $20,803.45, and, accordingly, that the taxable gain which the plaintiff realized from the sale of the land was $45,540.05.

The chief difference between the plaintiff and the Internal Revenue Service regarding the Texas land related to the plaintiff's initial basis in the land, which she originally acquired in connection with the distribution of the estate of her deceased father, John Stump. The plaintiff used the figure of $46,455 for this purpose, whereas the Internal Revenue Service determined that the plaintiff's initial basis in the four tracts of land amounted to $18,464.05.

The 898.29 acres of Texas land involved in this case consist of four tracts situated in Gray County, Texas. Tract 1 contains 80 acres, tract 2 contains 157 acres, tract 3 contains 21.29 acres, and tract 4 contains 640 acres.

Tracts 1, 2, and 3 together constitute a long and relatively narrow strip of land, approximately .2 mile wide and approximately 1.7 miles long, running from south to north. Hence, these three tracts are sometimes referred to collectively as "the land on the strip" or as "the strip land." In this strip, tract 1 is the northernmost parcel, tract 2 lies immediately south of tract 1, and tract 3 is the southernmost parcel. Tract 4 lies southeast of tract 3 and corners on the latter tract.

All four tracts are situated near and to the east of the caprock, an outcropping of rock which marks the exterior limits of the High Plains of Texas. In Gray County, the High Plains extend

---

* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57 (a).

westward from the caprock and are nearly level, having a slope of only about 8 feet per mile. Generally, in Gray County, the slope is to the southeast. The area lying to the east of the caprock in Gray County is commonly referred to as "the breaks," and the terrain here varies from gently rolling to steep and broken.

The land in the portion of Gray County that is situated on the High Plains has a deeper topsoil, is more fertile, and retains moisture better than the land that is situated in the breaks to the east of the caprock. Accordingly, the land on the High Plains is more valuable for agricultural purposes than the land in the breaks.

Tract 1 adjoins and is immediately to the east of the caprock and, hence, is just off the High Plains. The same is true of the northern portion of tract 2. The remainder of tract 2 and tracts 3 and 4 are not contiguous to the caprock, but they are not very far from it. Tract 4 is the most distant of the parcels from the caprcok, the western boundary of tract 4 being approximately 2 miles to the east of the caprock.

John Stump, the plaintiff's father, died intestate on July 9, 1925. For reasons that will be explained subsequently in this opinion, John Stump at the time of his death owned only one of the four tracts of Texas land with which we are concerned in the present case, and that was tract 1.

Under the governing provision of law in effect at the time when the plaintiff sold the Texas land in March 1952 (26 U.S.C. § 113(a) (5) (1952)), the initial basis for property acquired by inheritance was the fair market value of such property at the time of the acquisition. As previously indicated, the plaintiff's father died intestate in July 1925. It was not until July 1929, however, that the plaintiff received tract 1 in connection with the distribution of her father's estate, but this 4-year lapse between the death of the plaintiff's father and the distribution of part of his estate to the plaintiff was not significant from the standpoint of the present case, since the evidence in the record indicates that there was no substantial change in the fair market value of tract 1 during the period July 1925–July 1929.

Neither the plaintiff nor the defendant offered at the trial any opinion testimony from valuation experts with respect to the fair market value of tract 1 during the period July 1925–July 1929. However, there was presented at the trial evidence that is helpful in resolving this issue.

Tract 1 is an 80-acre parcel of farm land, and its highest and best use at all times material to this litigation was for agricultural purposes. Mr. Stump's estate valued tract 1 at $20 an acre for tax purposes, such valuation having been made by three independent appraisers. This circumstance, in my opinion, provides the most persuasive evidence in the record concerning the fair market value of tract 1 at the time of Mr. Stump's death, and also at the time when this tract was received by the plaintiff pursuant to the distribution of her father's estate, since no substantial change in the fair market value of the tract occurred during the intervening 4-year period.

The record contains evidence regarding some sales of agricultural lands in Gray County, Texas, during the period 1929–1932 at prices substantially higher than $20 an acre, e. g., a sale on August 2, 1929, of 298.46 acres located about 2 miles west of tract 4 for $65 an acre, a sale on February 27, 1930, of 200 acres located about 2 miles west of tract 2 for $75 an acre, and a sale on September 5, 1932, of 480 acres located about 4 miles west of tract 1 for $31 an acre. However, all of these sales involved lands situated west of the caprock and on the High Plains. As previously noted, the land on the High Plains has a deeper topsoil, is more fertile, holds moisture better, and is more valuable for agricultural purposes than the land in the breaks, such as tract 1.

The other sales of agricultural lands in Gray County during the pertinent period as to which we have evidence in the record involved lands in the breaks

east of the caprock, and the per-acre prices were all less than $20, except for one parcel of 320 acres located about 2½ miles northwest of tract 1, which sold for $21 per acre on March 8, 1928.

On the basis of the whole record, therefore, I believe that the fair market value of tract 1 during the period July 1925–July 1929 did not exceed $20 per acre, or a total of $1,600 for the tract.

As previously indicated, tracts 2, 3, and 4 were not owned by John Stump at the time of his death in July 1925. These tracts had been owned by Mr. Stump prior to July 1915, but in that month he conveyed them to Albert Converse for a total consideration of $8,-606.62, represented by 19 vendor's lien notes.

Nine of the vendor's lien notes mentioned in the preceding paragraph, totaling $2,206.62, were executed by Albert Converse as consideration for tracts 2 and 3. These notes were all dated July 22, 1915, and they were for the sum of $222.66 each, except that the ninth note was for the sum of $445.34, and each note bore interest at the rate of 8 percent per annum from the date of execution until paid, the interest being payable annually. These 9 notes were to be due and payable in successive years, on or before July 22, during the period 1917–1925.

Ten of the vendor's lien notes previously referred to, totaling $6,400, were executed by Albert Converse as consideration for tract 4. All these notes were dated July 23, 1915, and each was for the sum of $640 and bore interest at the rate of 8 percent per annum from the date of execution until paid, the interest being payable annually. These 10 notes were to be due and payable in successive years, on or before July 23, during the period 1916–1925.

Nothing (other than the 19 vendor's lien notes) was paid by Albert Converse to John Stump at the time of the conveyances previously mentioned.

Soon after the purchase of tracts 2, 3, and 4 by Albert Converse from John Stump, Mr. Converse made substantial improvements on the 818.29 acres of land included in the three tracts. Mr. Converse obtained from Mr. Stump all the money and materials required for these improvements. Mr. Converse and his family moved on the land, and they made their home there for approximately 5 years.

Sometime around 1920, Albert Converse and his family moved away from the land that he had purchased from John Stump in July 1915. Thereafter, Mr. Converse continued to exercise control over this land by leasing it to a third person or persons.

Albert Converse never made any payment of either principal or interest on the vendor's lien notes that he executed as consideration for the purchase of tracts 2, 3, and 4 from John Stump in July 1915. Furthermore, Albert Converse never made any payment to John Stump for the money and materials which Mr. Converse obtained from Mr. Stump for the construction of improvements on the land. As of July 20, 1924, 15 of the vendor's lien notes were overdue and unpaid, 2 of the notes were about to become due, and interest on all 19 notes since July 1915 was overdue and unpaid. Despite Albert Converse's default in the payment of principal and interest on the notes, John Stump did not exercise his right to foreclose his vendor's lien. Instead, Mr. Stump on July 20, 1924, extended all the notes so that they would mature on July 22, 1927.

As previously stated, John Stump died intestate on July 9, 1925. Mr. Stump's estate included (among other assets) the 19 vendor's lien notes signed by Albert Converse in connection with the purchase by Mr. Converse of tracts 2, 3, and 4 from Mr. Stump in July 1915. The face amounts of the notes, plus accrued interest at the time of Mr. Stump's death, totaled $16,864.05.

On September 14, 1927, the administrator of the estate of John Stump filed a petition against Albert Converse and his wife to foreclose the vendor's lien that had been retained by Mr. Stump

in connection with the sale of tracts 2, 3, and 4 to Mr. Converse in July 1915. On October 4, 1927, an order was signed by the court foreclosing the lien and granting all rights, title, and interest in tracts 2, 3, and 4 to the administrator of the estate of John Stump. Thereafter, in July 1929, tracts 2, 3, and 4 (together with tract 1) were transferred by the administrator to the plaintiff in connection with the distribution of Mr. Stump's estate to his heirs.

The defendant contends that the transaction described in the preceding paragraph was in the nature of a purchase of tracts 2, 3, and 4 by the administrator of Mr. Stump's estate, utilizing for this purpose assets of the estate, and the subsequent distribution of the purchased property to the plaintiff as one of Mr. Stump's heirs. In such a situation, according to the defendant, the basis of the heir (i. e., the plaintiff) in the property is the cost to the administrator, rather than the fair market value of the property at the date of its delivery to the heir. Maguire v. Commissioner, 313 U.S. 1, 8–9, 61 S.Ct. 936, 85 L.Ed. 1551 (1941). The cost of tracts 2, 3, and 4 to the administrator of Mr. Stump's estate was represented by the face value of the 19 vendor's lien notes which the administrator exchanged for tracts 2, 3, and 4, and the claim for accrued interest which the administrator surrendered, or a total of $16,864.05.

The plaintiff, however, says that the proper rule to apply respecting tracts 2, 3, and 4 is that the basis of property bid in by a mortgage creditor on foreclosure is to be determined by the fair market value of the property. Bondholders Committee etc., v. Commissioner, 315 U.S. 189, 193, 62 S.Ct. 537, 86 L.Ed. 784 (1942). Even if the proper criterion to be used in determining the plaintiff's initial basis in tracts 2, 3, and 4 is the fair market value of these parcels at the time of the foreclosure, the plaintiff's situation in the present litigation will not be improved.

Albert Converse was an industrious person, he had a good reputation in the community, and he was able to borrow money from banks to finance his farming operations. Therefore, the inference is warranted that Mr. Converse in the 1920's could have obtained a bank loan with which to pay off the vendor's lien notes, and accrued interest, that he had executed in connection with the purchase of tracts 2, 3, and 4, and thus could have cleared his title to these tracts prior to the 1927 foreclosure if the parcels had been sufficiently valuable to justify such a financial outlay. It thus seems reasonable to conclude that at the time of the foreclosure, tracts 2, 3, and 4 were not worth more, and perhaps they were worth less, than the $16,864.05 which it would have been necessary for Mr. Converse to pay in order to clear these tracts of the encumbrances.

This conclusion is not inconsistent with the information in the record concerning sales of Gray County agricultural lands during the pertinent period, and previously mentioned in discussing the fair market value of tract 1. During the pertinent period, Gray County lands in the breaks east of the caprock were generally selling for less than $20 per acre. Even at $20 an acre, the 818.29 acres in tracts 2, 3, and 4 would have a total value of only $16,365.80.

The fair market value of tracts 2, 3, and 4 continued to be about the same from the time of the foreclosure until July 1929, when they were transferred by the administrator to the plaintiff.

If, as previously indicated, the plaintiff's initial basis in tract 1 did not exceed $1,600, and her initial basis in tracts 2, 3, and 4 did not exceed $16,864.05, it necessarily follows that the plaintiff's initial basis in all four parcels did not exceed $18,464.05.

■ In connection with the assessment of the deficiency against the plaintiff for 1952, the Internal Revenue Service computed the plaintiff's initial basis in tracts 1, 2, 3, and 4 as including $1,600 for tract 1 (80 acres at $20 per acre) and $16,864.05 for tracts 2, 3, and

4, and then added $3,000 representing an amount which the plaintiff paid to her stepmother in consideration of the latter's interest in tracts 1, 2, 3, and 4 at the time of John Stump's death, thus making a total of $21,464.05. For the reasons previously set out in this part of the opinion, I believe that the Internal Revenue Service did not underestimate the plaintiff's initial basis in tracts 1, 2, 3, and 4. In any event, the determination of the Internal Revenue Service is prima facie correct, and the plaintiff has the burden of overcoming this presumption by the greater weight of the evidence (Johnson Motor Co. v. United States, 79 Ct.Cl. 151, 159 (1934)), which the plaintiff has not done.

Another problem concerning the amount of the taxable gain which the plaintiff realized from the sale of tracts 1, 2, 3, and 4 in March 1952 relates to the undepreciated cost of the improvements on the land. In this connection, the plaintiff and a friend who had lived and farmed in the vicinity of this land for many years testified concerning the nature and extent of the improvements which Albert Converse constructed on tracts 2, 3, and 4 and which were still on these tracts when the plaintiff received them in July 1929. Both witnesses expressed the opinion that such improvements were worth about $5,000 as of July 1929. The plaintiff also testified concerning the nature and extent of the improvements that were constructed on tracts 1, 2, 3, and 4 during the period of her ownership, which was from July 1929 until March 1952; and she estimated that these improvements cost her about $7,350. Thus, the testimony offered on behalf of the plaintiff would indicate a total cost of approximately $12,350 for the improvements on the Texas land; and since the plaintiff during the years of her ownership of the land claimed $3,227.50 as depreciation on the improvements, this would leave a figure of approximately $9,122.50 as representing the undepreciated cost of the improvements on the Texas land, to be added to the plaintiff's initial basis in determining her tax basis at the time of the sale of the land in March 1952.

The plaintiff and the other witness who testified for the plaintiff concerning the improvements on the Texas land were not—and did not pretend to be—experts with respect to costs or valuation, and the plaintiff did not support her estimate of $7,350 by presenting objective evidence concerning the actual expenditures made by her in connection with the improvements that were placed on the land during the period of her ownership.

The Internal Revenue Service used the figure of $2,050 as representing the cost of the improvements made by the plaintiff on the Texas land. There was testimony on behalf of the defendant at the trial to the effect that during the course of the audit which the Internal Revenue Service made of the plaintiff's income tax return for 1952, an Internal Revenue agent and the Texas attorney who was then representing the plaintiff mutually agreed on the figure of $2,050 for the cost of the improvements made by the plaintiff on the Texas land.

It would have been helpful if the parties had provided the court with more convincing evidence concerning the point now under consideration. Since they did not do this, however, the court must dispose of this phase of the case on the basis of the evidence which the parties elected to present to the court. In this connection, even the inexpert and imprecise evidence that was presented on behalf of the plaintiff is entitled to some weight, and it must be accepted in the absence of evidence to the contrary.

There is nothing in the record to indicate that the plaintiff was estopped from presenting evidence inconsistent with the agreement between her former attorney and the Internal Revenue agent concerning the cost of the improvements on the Texas land.

Therefore, it appears that the figure of $9,122.50 should be used as representing the undepreciated cost of the improvements on the Texas land.

The evidence indicates that there was an item of expense incurred by the plaintiff in connection with the acquisition of the Texas land which the Internal Revenue Service failed to take into account in computing the plaintiff's tax basis in such land as of the time of the sale in March 1952. When the plaintiff acquired tract 4 in July 1929, the State of Texas had a tax lien of $640 on this parcel, and the plaintiff paid $640 to the State in order to remove the tax lien.

In summary, it appears that the plaintiff's tax basis in tracts 1, 2, 3, and 4 as of the time when she sold these parcels in March 1952 should reasonably be regarded as consisting of the following items:

| | |
|---|---:|
| Initial basis in tract 1 | $ 1,600.00 |
| Initial basis in tracts 2, 3, and 4 | 16,864.05 |
| Cash paid to stepmother | 3,000.00 |
| Cash paid to State of Texas | 640.00 |
| Undepreciated cost of improvements | 9,122.50 |
| Expenses of March 1952 sale | 516.90 |
| Total tax basis | $31,743.45 |

Using the total tax basis of $31,-743.45, it is concluded that the plaintiff's taxable gain from the March 1952 sale of the Texas land amounted to $34,-600.05, instead of $22,599.10 (the figure reported by the plaintiff) or $45,540.05 (the amount determined by the Internal Revenue Service).

### Depreciation of Improvements on Missouri Land

A small portion of the deficiency which the Internal Revenue Service assessed against the plaintiff for 1952 was based upon a determination by the agency that the plaintiff, on her income tax return for 1952, claimed too large a deduction for the depreciation of the improvements on a Missouri farm.

In July 1952, the plaintiff purchased a farm near Elk Creek, Missouri, for the sum of $33,000. The farm contained 234 acres, and this total acreage consisted of approximately 161 acres of brush land, approximately 40 acres of pasture land, and approximately 33 acres of farm land.

On her Federal income tax return for 1952, the plaintiff allocated $23,636 of the purchase price to the improvements on the Missouri farm, and she allocated $9,364 to the land alone, using a valuation of $40 per acre. The plaintiff claimed depreciation on the improvements in the amount of $916.70.

During the course of the audit of the plaintiff's income tax return for 1952, an Internal Revenue agent and the Texas attorney who was then representing the plaintiff agreed that the Missouri land, stripped of all improvements, had a value of $75 per acre. The Internal Revenue Service thereupon allocated $17,500 out of the $33,000 purchase price for the Missouri farm to the land alone, made a corresponding adjustment downward in the allocation to improvements, and then recomputed the amount of the depreciation on the improvements for 1952 as being $599.42, instead of the figure of $916.70 claimed by the plaintiff.

The plaintiff testified at the trial concerning the nature of the land and the character of the improvements on the Missouri farm at the time when she purchased this farm in July 1952. She expressed the opinion that the pasture land was worth at least $60 an acre, that the farm land was worth perhaps $60 an acre, and that the brush land was worth perhaps $25 an acre. This opinion testimony by the plaintiff, even though inexpert, was not contradicted at the trial,

except for testimony concerning the prior discussion between an Internal Revenue agent and the Texas attorney who formerly represented the plaintiff.

The use of the per-acre figures to which the plaintiff testified at the trial would result in a valuation of $8,405 for the bare land; and this would indicate that when the plaintiff, on her 1952 income tax return, allocated $9,364 of the $33,000 purchase price for the Missouri farm to the land alone and $23,636 to the improvements, she did not underestimate the cost of the land and overestimate the cost of the improvements.

There is nothing in the record to indicate that the plaintiff was estopped from presenting at the trial evidence inconsistent with the agreement between the Texas attorney and the Internal Revenue agent that $75 an acre represented the valuation of the Missouri land stripped of improvements.

As was stated earlier in this opinion with respect to another matter, the evidence in the record on the point now under discussion is not as adequate as might be desired, but the court must nevertheless proceed to dispose of this issue in the light of the evidence which the parties have seen fit to present for the consideration of the court.

 Accordingly, on the basis of the record before the court, it appears that the Internal Revenue Service was not justified in reducing the plaintiff's 1952 deduction for depreciation on the Missouri farm improvements from $916.70 to $599.42.

### Failure to File Declaration of Estimated Tax

In connection with the plaintiff's income tax for 1952, the Internal Revenue Service imposed a penalty of $590.46 under Section 294(d) (1) (A) of Title 26, United States Code (1952). That statuotry provision stated in part as follows:

In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfac-

tion of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. * * *

The evidence clearly shows—and the plaintiff does not contend otherwise—that the plaintiff failed to file a declaration of estimated tax for 1952 within the time prescribed by law. The plaintiff does contend, however, that her failure in this respect was "due to reasonable cause and not to willful neglect."

The plaintiff was unaware in 1952 of the statutory requirement with respect to the filing of a declaration of estimated tax. This is not too surprising, since the evidence indicates that the filing of such declarations was not general among taxpayers in the Panhandle region of Texas as of 1952, and that the imposition of penalties upon taxpayers by the Internal Revenue Service because of the failure to file declarations of estimated tax was not common. This was not too long after the adoption of the current tax payment system, and plaintiff had never previously filed a Federal income tax return.

In connection with the sale of tracts 1, 2, 3, and 4 in March 1952, the plaintiff consulted J. W. Gordon, Jr., a practicing attorney of Pampa, Texas. Then after the Texas land was sold by the plaintiff, she consulted Mr. Gordon concerning the income tax consequences of the sale; and Mr. Gordon advised the plaintiff that this was a sale in which the tax would be imposed on a long-term capital gain. Mr. Gordon did not advise the plaintiff concerning the necessity of filing a declaration of estimated tax for 1952.

As previously indicated, the plaintiff was unaware of the requirement with respect to the filing of a declaration of estimated tax, and as Mr. Gordon failed

to advise her concerning this requirement when she consulted him for tax advice, she failed to file such a declaration for 1952.

It seems to me that the circumstances of this case, as previously outlined, warrant the conclusion that the plaintiff's failure to file a declaration of estimated tax for 1952 was "due to reasonable cause and not to willful neglect," and, accordingly, that the penalty in the amount of $590.46 which the Internal Revenue Service imposed on the plaintiff because of such failure was an improper penalty.